MANCINI v. UNITED STATES et al.

United States District Court
E. D. New York.
July 23, 1953.

Philip F. DiCostanzo, Brooklyn, N. Y., proctor for libelant. D. Camarada, New York City, of counsel.

Leonard Page Moore, U. S. Atty., New York City, proctor for respondent, by Martin J. Norris and Benjamin H. Berman, New York City, of counsel.

Purdy, Lamb & Catoggio, New York City, proctors for respondent-impleaded, by Vincent A. Catoggio, New York City, of counsel.

INCH, Chief Judge.

Libelant brings this action against the Government under the Public Vessels Act, 46 U.S.C.A. § 781 et seq., and the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., for personal injuries sustained by him on February 14, 1949 while working as a longshoreman aboard the U. S. Army Transport Corporal Eric G. Gibson at the Brooklyn Army Base.

The Government has impleaded libelant's employer Pittston Stevedoring Corporation which was engaged in discharging a cargo of war dead and empty caskets from the Gibson pursuant to a written contract.

A draft of two caskets fell on libelant while he was working in the No. 2 hold of the vessel, and it is his contention that the accident was caused by a defective deck winch. He claims the government was negligent in failing to properly inspect, maintain and repair the winch, and failed to provide him with a safe place to work and that the vessel was unseaworthy.

The main issue on the trial was whether the accident was caused by a defective winch or whether it resulted from the negligence of libelant's fellow-longshoremen. This issue was fully tried and briefed, and it is my opinion that the credible evidence clearly favors a finding that the falling of the draft was due to a mechanical failure of the forward starboard winch at the No. 2 hatch and that it was not due to any other cause.

Libelant called three longshoremen of the gang which operated the winch on Friday, February 11, 1949, three days prior to the accident. They testified that on the morning of February 11, 1949 when they started work they observed that the gears of the winch were not meshing properly. Garguilo, the gangwayman, stated that the "second" or "low gear" was "only in there about a quarter of an inch". Bracco, the hatch boss, said he saw that "it wasn't all the way fit in * * * just at the tips it was in", and Barbagallo, the winchman, testified that "the gear was not in place". The substance of their testimony was that they informed one of the ship's mates of the condition and that he summoned the Deck Engineer, who with another crew member attempted to force the gears into position with a crowbar, and after working on the gears for about a half hour without success, placed blocks of wood alongside the gears to hold them in place. The Deck Engineer then informed the longshoremen that the winch

was alright to work, and they operated the winch for the remainder of the day without incident.

The stevedores did not work over the weekend, and on the following Monday morning, February 14, 1949, they again came aboard the vessel, and libelant's gang was assigned to the No. 2 hold. They uncovered the hatch and began to discharge the cargo of caskets and war dead. Because of the solemnity of the occasion the winch was operated in low gear. An extension handle of three or four pieces of dunnage had been tied to the handle of the winch on Friday, February 11th, by the previous gang for the purpose of getting better leverage on the winch handle and also to enable the winchman to look directly down the hold rather than to operate the winch by taking signals from a gangwayman. The gang had been working about 15 or 20 minutes and had removed approximately 15 drafts from the hold when the accident occurred. According to the testimony of three members of libelant's gang, including the winchman, the draft which struck libelant was being raised by the forward starboard winch at the No. 2 hatch, and after having been raised about 10 or 15 feet, it suddenly fell into the hold and struck libelant and another longshoreman. The fall of the draft was variously described by the witnesses as having occurred with such suddenness that "nobody had a chance even if you yelled, nobody could get out of the way"; it happened "in the blink of the eye" or a snap of the fingers. Immediately after the accident each of these three witnesses inspected the winch and observed that the gears were not meshed properly, but were "holding by just a hair", "just at the tip", "almost out". It is significant that the winchman in a statement to a Government agent on the day of the accident expressly described the existence of such a defect in the winch. He stated: "The upper double gear of the winch was about ½ inch in position and in gear. The gear was not fully set in when I examined it immediately after the accident".

It is also significant that when the accident happened all the interested Government personnel immediately inspected the mechanism of the winch. Four of the ship's officers together with the Port Engineer and the Port Safety Engineer made certain tests on the winch and attempted to pry the clutch out of gear with a crowbar. Although they claimed that the winch was not defective, Burgess, the Port Engineer, admitted that the clutch "was engaged about five-eighths of an inch, better than half an inch, which was about half the distance of the male and female meshing". He also admitted that if the clutch came out so that only the tips of the gears were touching, the load would drop.

Barden, the Government's Safety Director at the Army Base, admitted that the customary test of the operation of a winch is to test it with a load. The Government's witnesses, however, made no such test.

In addition to the evidence set forth above as to the defect in the winch on February 11, 1949, the Friday prior to the accident, and on February 14, 1949, the date of the accident, there is evidence in the Gibson's Engine Room Log Book that repairs were made to this winch on February 10th, the date of the vessel's arrival in New York. Although the Government attempted to show that this entry referred to a winch at a different hatch, the deposition of Teffeau, the ship's First Assistant Engineer, clearly indicates that the repairs were made to the winch involved in this accident. Further, records of the ship's activities, recorded by the Army timekeeper disclosed that on the day following the accident there was a "Standby on account of faulty winch" at the No. 2 hatch forward from 9:30 to 10 A.M., and the superintendent of Pittston testified that the No. 1 starboard winch was rigged in order to discharge the remainder of the caskets in the No. 2 hold.

Despite this substantial amount of evidence as to the defective condition of the winch, the Government urges two rather speculative theories as to the

cause of the accident. It is contended that the accident may have occurred "either through the confusion of the winch operator Santomarco in operating the winch handle contrary to the normal manner in which a winch handle is used or in his failure to properly control the winch handle after the pieces of dunnage tied together by rope yarn became loose." (Brief p. 7.)

As to the first theory, it is pointed out that because of the manner in which the wooden extension handle was affixed to the winch handle, it was necessary for the winchman to depress the extension handle in order to raise the draft, which was the reverse of the normal operation of the winch handle, and that in raising this draft the winch operator may have suddenly reverted to his normal "habit pattern" of raising the lever instead of depressing it. The difficulties with this theory are threefold. First, there is no evidence that the winchman operated the handle in the wrong direction, that is, that he raised the extension handle instead of holding it depressed. Secondly, it is undisputed that the draft was in the process of being raised and that when it reached a height of 10 to 15 feet it suddenly fell. No evidence was offered as to any reason for the winchman to have manipulated the handle at this point in the draft's rise. Thirdly, the winch was concededly operating in low gear and had the winchman reversed the direction of the draft, it is reasonable to believe that it would have come down slowly and would not have dropped as suddenly as it did.

The Government's second theory that the accident may have occurred through the failure of the winchman to properly control the winch handle, because the pieces of dunnage tied to it allegedly became loose, is likewise unsupported by the evidence. The only testimony concerning any such condition of the wooden extension was given by the Port Engineer who inspected the winch after the accident. He stated:

"Secondly, I will say that the sticks, well, when I looked at them, there was enough play in the strings, in those strings, to create an awful lot of misoperation in between movements.

"The Court: In the strings?

"The Witness: Yes, your Honor, these strings, the cords that they had which tied the sticks, tied the sticks first to the throttle lever and then, through two other motions, over the hatch.

"The Court: I see. All right.

"The Witness: Those are just my thoughts. I couldn't think of anything else."

This was, at best, speculation on the part of this witness alone, for none of the eye-witnesses, or any of the Government's other witnesses, testified to any such defect in the extension handle.

The Government also claims that the use of the extension handle placed the winchman approximately 15 feet away from the foot brake on the winch and that such a method of operation was negligent and dangerous. However, in addition to the fact that the longshoremen and several of the Government's witnesses testified that it was a customary practice at the Army Base to use extension handles on steam winches, it is plain that the suddenness of the accident would have prevented the winchman from using the foot brake, particularly since the foot brake on this winch was three feet above the deck, and the winchman would have been taking signals from a gangwayman and would not have been looking directly down the hold.

Accordingly, I find the Government was negligent in failing to properly inspect and repair the forward starboard winch at the No. 2 hatch and in permitting the longshoremen to work with the defective winch, that the vessel was unseaworthy and that such negligence and unseaworthiness was the proximate cause of libelant's injuries.

There is no basis for any finding of contributory negligence on the part of libelant for allegedly having failed to get out of the square of the hatch before the

draft fell. The draft had been raised only 10 to 15 feet, and there is evidence that libelant, who had assisted in steadying the draft, was already off to the side although "not exactly underneath the coaming".

I likewise find no basis for a right of contribution or indemnity in favor of the Government against Pittston Stevedoring Corporation. The Government claims indemnity under its contract with Pittston which provides in part as follows:

"Article 14.   Liability and insurance

\*      \*      \*      \*      \*

"(b) The Contractor shall not be responsible to the Government for and does not agree to hold the Government harmless from loss or damage to property or bodily injury to or death of persons:

"(1) If the unseaworthiness of the vessel or failure or defect of the gear or equipment furnished by the Government contributed jointly with the fault or negligence of the Contractor in causing such damage, injury or death, and the contractor, its officers, agents and employees by the exercise of due diligence, could not have discovered such unseaworthiness or defect of gear or equipment, or through the exercise of due diligence could not otherwise have avoided such damage, injury or death.

"(2) If the damage, injury or death resulted solely from an act or omission of the Government or its employees or resulted solely from proper compliance by officers, agents or employees of the Contractor with specific directions of the Contracting Officer."

It is the contention of the Government that, assuming the winch was a defective or unseaworthy appliance, the condition was open and apparent and Pittston should have discovered it in the exercise of due diligence. The Government appears to urge that subdivision (1) above indicates an intention on the part of the stevedoring company to indemnify the Government for a defective condition in an appliance furnished by the Government which the stevedores could have discovered in the exercise of due diligence.

As already indicated, the accident did not occur as the result of any negligence on the part of Pittston's employees in operating the winch. It was caused by the negligence of the ship's crew in failing to properly repair the winch on the Friday before the accident and in failing to inspect and repair the winch on the date of the accident. Article 1(h) of the agreement between the Government and Pittston specifically required the Government to "furnish and maintain" the winches "in good working order", and the ship's Chief Engineer testified that it was the duty of the Deck Engineer, under his supervision, to inspect and repair the winches during the loading and unloading of cargo. Under such circumstances, the stevedores were entitled to rely on the inspection and repairs made by the Deck Engineer on the Friday prior to the accident. There is no proof that the stevedores knew, or should have known, that the winch had again become defective prior to the happening of the accident. Thus, subdivision (2) of Article 14(b) applies to the instant case, for the injury resulted solely from an act or omission of the Government employees. Subdivision (1) of Article 14(b) has no application here since that provision expressly relieved Pittston from any liability to the Government even in situations where the negligence of Pittston "contributed jointly" with the negligence of the Government in furnishing defective or unseaworthy equipment which caused an accident, provided Pittston could not have reasonably discovered such defect or unseaworthiness.

We come now to the question of damages. Libelant was hospitalized at the Shore Road Hospital following the accident where he was treated for a fractured and lacerated right ankle, for

multiple contusions and for pain and tenderness of the right shoulder, back and both jaws. He remained at the hospital for three weeks and used crutches for three months. Libelant indicated that he continues to have residual pain in his right leg and back, that he has been unable to work since the accident and that he is required to wear a corset and use a cane in order to get about. X-rays taken in 1950 indicate that the libelant's ankle fracture has not healed properly and that he has a permanent partial disability of the right leg. There is also evidence that libelant has a condition of fibrosis in the muscles of his back which has resulted in the loss of some of the normal elasticity of his back. However, after considering the conflicting medical evidence with respect to libelant's alleged "traumatic neurosis" I am inclined to agree with the opinion of Dr. Hyslop, a well-qualified neurologist and psychiatrist who testified on behalf of the Government, that libelant "is not genuinely disabled by a psychoneurosis." Thus, while libelant is apparently unable to resume his former employment as a longshoreman due to the orthopedic injuries which he sustained in the accident, it is my opinion that he is able to engage in some form of light work.

At the time of the accident libelant was almost 52 years of age, and his earnings as a longshoreman were $4,536.26 in 1947 and $4,166.00 in 1948. Pittston Stevedoring Corporation has expended $888.89 for medical expenses, in addition to $2,170 for compensation payments, and there is $750 owing to Dr. Bastable for treatment rendered libelant during 120 visits. Taking into consideration libelant's loss of past and prospective earnings, his pain and suffering, and all the other factors above mentioned, I am of the opinion that a just award for the damage suffered by libelant is $40,000.

Findings of fact and conclusions of law are being filed simultaneously herewith.

Settle decree.